## COUNTIES

### CODE HOME RULE COUNTIES – POWER TO REGULATE THE FORMATION OF HOMEOWNERS ASSOCIATIONS TO ENSURE THEIR ABILITY TO MAINTAIN INFRASTRUCTURE AND COMMON AREAS

August 8, 2013

*The Honorable Candice Quinn Kelly, President*
*County Commissioners of Charles County*

On behalf of the Board of Commissioners of Charles County (the "County"), you have asked for our opinion on the County's power, as a code home rule county, to prospectively regulate the creation of homeowners associations ("HOAs") to ensure their ability to maintain the common areas and facilities under their control. The County has already enacted subdivision regulations that generally require HOAs to be structured in such a way as to ensure their ability to fulfill their maintenance obligations and that authorize the County Commissioners to review the adequacy of deed restrictions governing an HOA's maintenance of common open spaces. The County now wishes to regulate HOA bylaws explicitly but is concerned that the Maryland Homeowners Association Act ("HOA Act")[1] might limit its authority to do so. The County also wishes to impose various financial conditions on the developers of these communities.

You pose three questions:

> 1. Does Charles County, as a Code Home Rule County created under Article XI-F of the Maryland Constitution, have the power to enact a public local law wherein the County can require a developer to insert provisions into the HOA governing documents created for new developments?
>
> 2. Does § 11B-104(b) of the Real Property Article prevent Charles County from enacting such a public local law?

---

[1] Md. Code Ann., Real Property ("RP") §§ 11B-101 *et seq.* (2010 Repl. Vol., 2012 Supp.).

3. Can Charles County pass a public local law that would require developers to agree to certain financial terms that would be subject to County Attorney office approval (*e.g.*, requiring that developers increase reserve funds and pay dues for unsold lots)?

In answer to your first question, we conclude that a code county has the implied authority to enact such local HOA governance measures as necessary to ensure that the county's stormwater and forest preservation programs meet the maintenance standards mandated by the State statutes applicable to those programs. Accordingly, when a developer proposes that the stormwater facilities and forest resources in an HOA development will be maintained by an HOA, the County[2] may review the proposed HOA's bylaws to assess whether the HOA has been structured so as to be capable of performing its maintenance functions. A code county's authority to regulate HOA governance may also be inferred from various State statutes pertaining to land use and infrastructure within the county.

As to your second question, we conclude that the HOA Act does not generally bar the County from regulating HOA governance as a means of implementing its stormwater and other land use powers. The County may not, however, relax the few requirements that the HOA Act imposes on HOA governance. Those requirements pertain to open meetings, access to records, and fidelity insurance for HOA directors, among other things. Further, the County's measures must be consistent with the provisions of the Corporations and Associations Article applicable to HOAs that take the form of nonstock corporations. *See* Md. Code Ann., Corporations and Associations §§ 5-201 *et seq.*[3] Section 5-206 of that Article is particularly relevant here, as it specifies how a nonstock corporation may take an action if the number of members at a meeting is insufficient to form a quorum.

The answer to your third question depends on the circumstances. As a general proposition, it is our view that the County may require a developer to pay HOA dues for unsold lots

---

[2] The term "County," as used in this opinion, broadly includes the Planning Commission. We leave to the County Commissioners the allocation of functions in accordance with the Land Use Article.

[3] All references to the Corporations and Associations Article ("Corporations Article" or "CA") are to the 2007 Replacement Volume of the Maryland Annotated Code, as updated in the 2012 supplement.

within the development and to increase the size of the reserve account funded by the developer, subject to limits: The measures must relate to the purposes of the statutes under which the County acts and must not effect an impermissible exaction or taking. The HOA Act and Corporations Article would not preempt either financial measure.[4]

# I

# Background

## A. *The Problem to be Addressed—HOAs that Cannot Perform Their Maintenance Functions*

### 1. Problem HOAs in Charles County

The County's initial opinion request set forth the following background:

> Over the last few years, Charles County has been receiving an increasing amount of complaints from residents of communities with Homeowners' Associations (HOAs) regarding the management of community funds, enforcement of covenants, and the general accountability of their Boards of Directors and management companies. The County has also been receiving an increasing number of pleas from HOAs for assistance with items that they are obligated to maintain (e.g., storm water ponds, sidewalks, and roads), but cannot because of their inability to raise dues without cooperation from HOA residents. After working with residents and studying the issues, it has become clear that the root of many of these issues stem from poorly written governing documents. Essentially, these documents are written by developers, who have no incentive to ensure sustainability of the HOA into the future. Further, they are written under the assumption that residents will comply with

---

[4] Our conclusions do not apply to other forms of common-ownership communities. The State laws on condominium associations and cooperative housing corporations would preempt many local measures on those entities' governance.

the requirements, and that residents will be active in their community by attending meetings. Instead, HOA Boards complain that resident cooperation is very slim, which prevents them from getting anything done, usually due to quorum requirements that are nearly impossible to meet, and the inability to substantially raise dues without a quorum.

\* \* \*

Charles County has determined that it would be in the best interests of our residents if the County took a more active role in the development of HOA governing documents.

As the Office of the County Attorney stated in a subsequent letter, the county wishes to "place safeguards in the HOA governing documents (to make sure the HOA is set up to be self-sustaining) and to have developers preemptively agree to help fix unexpected financial difficulties that arise." The letter states that "[t]he global issue is that several Charles County homeowners' associations are unable to maintain their public facilities because they simply lack the required resources."

Charles County has had trouble for over a decade with poorly-maintained stormwater management facilities in HOA developments. Its 2006 Comprehensive Plan explains:

The lack of maintenance of stormwater management facilities in particular is of concern to the County especially in watersheds in the development district that drain to impaired waters such as Mattawoman Creek, the Port Tobacco, and Zekiah Swamp Run. Many facilities are in disrepair and need various levels of restoration and/or maintenance.

In most cases the maintenance burden has fallen on private property owners, often a homeowners' association. In 2001, a Charles County Homeowners' Association Task Force reported that in many cases these

> property owners are responsible for facilities that benefit other private or public users, yet they have no practical recourse to collect a proportionate share of the maintenance expense from these other parties.
>
> Dealing with these issues involves a somewhat "gray" area between public and private ownership, interests, and rights of access, but this area needs to be resolved to meet public health, safety, and natural resource objectives.

*Charles County Comprehensive Plan* 6-28 (2006). The 2001 Task Force recommended, among other things, "[l]egislative revisions to authorize the County to undertake maintenance and repair of facilities serving more than one property, including retrofits to critical non-functioning facilities." *Id*. at 6-29.

### 2. Problem HOAs Elsewhere

The HOA governance and maintenance problems noted by Charles County are not uncommon, either in Maryland or nationally. In 2005, the General Assembly enacted legislation that established the Task Force on Common Ownership Communities and required it to address, among other things, "issues relating to the collection of assessments." 2005 Md. Laws, ch. 469; *see also* Task Force on Common Ownership Communities, *Final Report* 8 (2006). The Task Force remarked that "[t]he requirement of unanimous or near unanimous consent" for changing governing documents "has proven burdensome" and recommended that the requirement be addressed legislatively. *Id.* at 21. In 2008, the General Assembly enacted RP § 11B-116, which allows HOAs to amend their governing document "by the affirmative vote of lot owners having at least two-thirds of the votes in the development," or by a lower percentage if the governing document so permits. 2008 Md. Laws, chs. 144, § 2 and 145, § 2.

The problems occasioned by malfunctioning HOAs, and poorly-maintained common areas, continue to pose challenges for local governments. In 2011, the Cecil County Planning Commission appointed a Subcommittee on Homeowners Associations to address, among other things, "future financial concerns for the County in fixing and/or maintaining Stormwater problems with both current 'inactive' HOAs and new developments with HOAs . . . ." Cecil County Planning

Commission, *Homeowners Associations and Common Open Space (Stormwater Management) Study* 3 (December 19, 2011). According to the study, the Cecil County Planning Commission had become aware of "the increasing number of ineffective or simply non-functioning HOA's" and, "[i]n particular," was "very concerned about the impact of unmaintained Stormwater Management facilities within the Common Open Space designation areas." *Id*. at 4. The study stated "a pressing need to keep in mind that there are a significant number of 'inactive' associations (approximately 150)," *id*. at 5, and expressed the Planning Commission's wish to "be proactive in bringing our Stormwater Management facilities up to code." *Id*. at 4.

Nationally, as in Maryland, HOA failures have led to concerns about the maintenance of HOA communities and deterioration of the housing stock. The problems caused by low homeowner participation in HOA governance[5] have been exacerbated by the mortgage foreclosure crisis, which, in many places, has resulted in unusually high numbers of unoccupied houses and delays in foreclosure proceedings and subsequent re-occupancy. One commentator gave this view of the effect of the mortgage crisis on common-interest communities ("CICs"), including HOAs:

> In the context of today's lengthy mortgage foreclosure timelines, neighbors in CICs have become truly financially interdependent, and the failure of some owners to pay their fair share of common costs requires a greater financial contribution by the others. During the months or years that mortgage foreclosure on a unit is threatened or pending, the association still must pay for upkeep, utilities and necessary repairs; its only source of revenue is increased assessment payments by those owners who are still able to pay. . . .

\*    \*    \*

---

[5] For a discussion of the possible causes of low participation in homeowner association governance, see David C. Drewes, *Note: Putting the "Community" Back In Common Interest Communities: A Proposal For Participation-Enhancing Procedural Review*, 101 Colum. L. Rev. 314, 334-38 (2001).

> If neighbors refuse to privately fund deficiencies, lack of association funding for maintenance, insurance, and management of common property will eventually lead to a deterioration of the housing stock.

Andrea J. Boyack, *Community Collateral Damage: A Question of Priorities*, 43 Loy. U. Chi. L.J. 53, 61-62 (2011).

### 3. The Effect of Failing HOAs on Local Government Budgets

Commentators have also remarked on the effect of failing HOAs on local government budgets. Although common ownership of a development's facilities by its homeowners is not new, the practice proliferated throughout the last part of the 2000s, when some local governments viewed HOA developments as a way to increase their tax bases without funding the installation and maintenance of the infrastructure needed to serve the new housing. *See*, *e.g.*, Brian J. Fleming, *Regulation of Political Signs in Private Homeowner Associations: A New Approach*, 59 Vand. L. Rev. 571, 578 (2006) (describing the growth of HOA ownership of infrastructure over "the last several decades"); Daniel P. Selmi, *The Contract Transformation in Land Use Regulation*, 63 Stan. Law Rev. 591, 604-06 (2011) (attributing the assignment of infrastructure costs to developers to the political difficulties of raising taxes); James L. Winokur, *Critical Assessment: The Financial Role of Community Associations*, 38 Santa Clara L. Rev. 1135, 1139 (1998) (referring to the community association model as "a major vehicle for shifting responsibilities previously associated with government agencies to the private sector").

This shifting of infrastructure costs and functions from local governments to HOAs—sometimes referred to as "load shedding," *see* Robert J. Dilger, *Neighborhood Politics: Residential Community Associations in American Governance* 87-103 (1992)—has given rise to much discussion on whether to characterize HOAs as "quasi-government" entities. *See*, *e.g.*, David J. Kennedy, *Residential Associations as State Actors: Regulating the Impact of Gated Communities on Nonmembers*, 105 Yale L.J. 761, 778 (1995) (remarking on HOAs' "interdependent relationships with local governments"); *see also Pines Point Marina v. Rehak*, 406 Md. 613, 635 (2008) (in discussing common-interest communities, stating, "'The association is, in essence, a private government.'") (quoting Patrick J. Rohan & Melvin A. Reskin, Real Estate Transactions:

Condominium Law and Practice § 1.06 (2008)). Styled differently as a "privatization" of government functions, HOAs have also been characterized as a means by which homeowners can diminish the role of government in their lives. *See* Dilger, *supra*, at 87-88; Robert H. Nelson *Privatizing the Neighborhood: A Proposal to Replace Zoning with Private Collective Property Rights to Existing Neighborhoods*, 7 Geo. Mason L. Rev. 827, 852-56 (1999).

Either way, the assumption has been that the financial load "shed" by a local government when it approves a residential HOA subdivision will be borne by the developer in the first instance and then by the members of the HOA. The difficulty comes when that assumption proves to have been flawed, and the local government must either maintain privately-owned facilities that were never subject to its overall planning and budgeting process for public infrastructure or else address the effects of the deterioration of those facilities. It is our understanding that the objectives of the County's proposed measures are to deter the deterioration of HOA-owned communities and to increase the likelihood that, for future HOA subdivisions, the financial load of HOA facility maintenance will remain with the developer and HOA members.

### B. *The Legal Authorities that Govern HOAs: The HOA Act, the Corporations Article, and the County Subdivision Regulations*

### 1. The Homeowners Association Act

The HOA Act was originally enacted in 1987 as a consumer protection measure for the benefit of purchasers and potential purchasers of residential lots in certain types of developments. Specifically, the Act applies to developments that contain twelve or more lots and that are governed by an HOA with the authority to levy mandatory fees for services such as the maintenance of common areas. *See* RP §§ 11B-101(d), (i), 11B-102(d); *see also* 72 *Opinions of the Attorney General* 158, 160 (1987) (recounting the history of the Act). As described by the commission that recommended the measure, the legislation had three basic purposes: "to provide consumers with adequate disclosure about the homeowners association in which they will become members, to provide basic warranties on common areas in the homeowners association, and to provide fundamental provisions governing the operation of homeowners associations." Final Report – 1985 Legislative Session, Governor's Commission on Condominiums, Cooperatives and Homeowners Associations, at 9.

The Act now comprises thirty-three sections that mostly fall into one or more of the three categories addressed by the original enactment: disclosures, warranties, and fundamental operations. It also contains a section that addresses the scope of a local government's powers on the subjects addressed by the Act. The disclosure, fundamental operations, and local government provisions bear on your questions; the warranty provisions do not.

### *Adequate Disclosure Provisions*

The "adequate disclosure" provisions of the Act require sellers of lots in a residential development that is subject to fees and restrictions set by a homeowners association to disclose to buyers all governing documents "to which the purchaser shall become obligated," RP § 11B-105(b)(6)(i), including the declaration that creates the obligation. *See* RP § 11B-101(d) (defining "declaration" as the recorded instrument that creates the HOA's authority to impose mandatory fees for services "or otherwise" for the benefit of the lots, common areas, or owners or occupants of lots). The developer's disclosures to a consumer must include information such as the association bylaws, fees, and responsibility for common-area maintenance, RP § 11B-105(b)(6)-(9), as well as "[a] brief description of zoning and other land use requirements affecting the development . . . ." RP § 11B-105(b)(10).[6] The Act establishes, in each circuit court, a "depository" into which each HOA in that county must deposit many of the disclosures required by law. *See* RP § 11B-113(a), (c). The object of the disclosure requirements is to ensure that a buyer is provided with "the facts that will allow the buyer to make a rational judgment about whether to contract for the particular house." 72 *Opinions of the Attorney General* at 161.

### *Fundamental Operations Provisions*

The "fundamental operations" provisions of the Act address some, but not all, aspects of the governance and management of HOAs. The voting participation provisions address only three discrete topics: changes to bylaws and other governing documents, the prohibition of family child care and "no-impact home-based business" uses, and the removal of discriminatory covenants from a governing document. RP §§ 11B-116(b), 11B-111.1(d), and 11B-113.3, respectively. Other governance

---

[6] Similar disclosure requirements apply to the resale of a lot subject to the Act, RP § 11-106, and to the sale of a non-residential lot subject to the Act. RP § 11B-107.

provisions pertain to open meetings and records, RP §§ 11B-111, 11B-112, and 11B-113.1; fidelity insurance, RP § 11B-111.6; the HOA board's submission of a proposed budget to the lot owners for their approval, or the approval of any other body to which the HOA has delegated that authority, RP § 11B-112.2(d); late charges for dues assessments, RP § 11B-112.1; and candidate or ballot question signs. RP § 11B-111.2. The HOA Act also provides for the resolution of disputes between homeowners and HOAs, RP § 11B-104(c); liens for unpaid assessments, RP § 11B-117; and a mechanism by which three members of an HOA may petition the circuit court for the appointment of a receiver to manage the affairs of the association when, after notice, the HOA "fails to fill vacancies on the governing body sufficient to constitute a quorum in accordance with the bylaws . . . ." RP § 11B-111.5.[7]

*Provisions on Local Government Powers*

Two sections of the Act specify subjects on which local governments may and may not legislate. RP § 11B-104, the section about which you ask, sets forth the Act's effect on local land use laws. As relevant here, it provides:

> (a) The provisions of all laws, ordinances, and regulations concerning building codes or zoning shall have full force and effect to the extent that they apply to a development and shall be construed and applied with reference to the overall nature and use of the property without regard to whether the property is part of a development.
>
> (b) A local government may not enact any law, ordinance, or regulation which would:
>
> > (1) Impose a burden or restriction on property which is part of a development because it is part of a development;

---

[7] For an example of the application of the Maryland Contract Lien Act, RP §§ 14-201 *et seq*., to unpaid HOA assessments, see *Monmouth Meadows Homeowners Association v. Hamilton*, 416 Md. 325 (2010) (addressing the determination of attorneys' fees to be awarded in Contract Lien Act actions brought by HOAs to collect assessments from property owners).

(2) Require that additional disclosures relating to the development be made to purchasers of lots within the development, other than the disclosures required by § 11B-105, § 11B-106, or § 11B-107 of this title;

(3) Provide that the disclosures required by § 11B-105, § 11B-106, or § 11B-107 of this title be registered or otherwise subject to the approval of any governmental agency; [or]

\* \* \*

(6) Expand the open meeting requirements of § 11B-111 of this title or open record requirements of § 11B-112 of this title.

Additionally, RP § 11B-115(d) provides that "[a] county or municipal corporation may adopt a law, ordinance, or regulation for the protection of a consumer to the extent and in the manner provided for under § 13-103 of the Commercial Law Article." Section 13-103, which is part of the Maryland Consumer Protection Act ("CPA"), provides that the CPA "is intended to provide minimum standards for the protection of consumers in the State," Md. Code Ann., Com. Law ("CL") § 13-103(a) (2005 Repl. Vol.), and that "[a] county, . . . municipality or agency of either may adopt, within the scope of its authority, more stringent provisions not inconsistent with the provisions of this title." CL § 13-103(b).

## 2. Corporations Article Provisions Applicable to HOAs Organized as Nonstock Corporations

The provisions of the Corporations Article applicable to nonstock corporations also bear on the issues you raise. As reflected in the HOA Act, a "homeowners association" may take the form of "an incorporated or unincorporated association." RP § 11B-101(i) (defining "homeowners association"). Many HOAs take the form of nonstock corporations and are thus subject to various governance provisions in the Corporations Article applicable to such corporations. *See* CA §§ 5-201 *et seq.* (containing provisions specific to nonstock corporations); § 5-201 (providing generally that "[t]he provisions of the Maryland General Corporation Law apply to nonstock corporations" unless the context or more specific provisions in the Article provide

otherwise).[8]    Under CA § 1-102(c), the provisions of the Corporations Article are "in addition to and not in substitution of any other requirements of law relating to any particular . . . class of corporation."  When the general provisions of the Corporations Article conflict with a State law specific to a particular class of corporations, the specific law applies.  CA § 1-102(c), (d).  In sum, the Corporations Article provisions applicable to nonstock corporations supplement the HOA Act in many cases, and those provisions may also preempt local measures.

### 3.    The County Subdivision Regulations

Two of the County's subdivision regulations set criteria for the approval of subdivision applications that propose to establish an HOA to maintain common areas and improvements not accepted for County ownership.  Charles County Code ("County Code") § 278-63 requires the developer to establish the HOA before the final approval of the subdivision plat.  County Code § 278-63A(1).  It further provides:

> A. The developer shall certify, pending the acceptance of that certification by the Planning Commission during the approval of the final subdivision plat, that the common open space and improvements not dedicated and accepted for public ownership will be maintained and cared for. The developer shall also certify that an organization for the ownership, maintenance and preservation of open space has been established in conformance with the following standards and procedures:
>
> *   *   *
>
> (2) The financial and organizational structures, rules of membership and methods of cost assessment of the organization shall be devised to ensure the successful fulfillment of the maintenance, preservation and improvement responsibilities of the organization.

---

[8]  For applications of the Corporations Article to homeowners associations, see *Pines Point Marina*, 406 Md. 613, and 76 *Opinions of the Attorney General* 105 (1991) (discussing the applicability of the Corporations Article to an incorporated community association; concluding that a prohibition on proxies must be done by charter).

* * *

(4) Areas set aside to meet the open space requirements hereof shall be adequately described. Instruments in the form of deed restrictions and/or covenant[s] shall be provided to ensure the purpose for which the open space is provided will be achieved. Compliance with the above shall be demonstrated to the Department of Planning and Growth Management and the County Attorney's Office prior to recordation among the Land Records of Charles County.

County Code § 278-45C provides:

Where the subdivision contains sewers, sewage treatment plants, water supply systems, park areas or other physical facilities necessary or desirable for the welfare of the area and which are of common use or benefit and which are of such character that the county or other public agency does not desire to maintain, then provision shall be made by legal arrangements incorporated into the deed restrictions and which are acceptable to the County Commissioners for the proper and continuous maintenance and supervision of such facilities by the lot owners in the subdivision.

## II

### Analysis

#### A. The Powers of a Code County, Generally, to Enact "Local Laws"

Maryland counties and municipalities "are but local divisions of the State." *Rockville v. Randolph*, 267 Md. 56, 62 (1972). They therefore possess only the powers that have been granted to them by the State, either through the Maryland Constitution or, within the constraints imposed by the Constitution, the enactments of the General Assembly. *See Kent Island Def. League, LLC v. Queen Anne's County Bd. of Elections*, 145 Md. App. 684, 689 (2002). Those powers may be supplemented through the judicially-created doctrine of implied authority, *see Barlow v. Friendship Heights Citizens' Comm.*, 276

Md. 89, 95 (1975), or limited through the doctrine of preemption. *Coalition for Open Doors v. Annapolis Lodge No. 622*, 333 Md. 359, 379 (1994).

As relevant here, the counties' chief constitutional powers include choosing which type of government to adopt—Charles County chose the "code home rule" method in 2002—and then enacting such "local laws" as fall within the powers that the General Assembly has granted to local governments of that type. *See* Md. Const. art. XI-F (providing home rule for code counties)[9]; *see also Miller v. Pinto*, 305 Md. 396, 404 n.5 (1986) ("In a code county, . . . once the citizens of the county have voted to adopt code home rule status the authority of the local legislative body is prescribed by state statute."). The County's statutorily-granted powers appear both in Maryland Code Article 25B,[10] which lists various types of authority granted to code counties, and other enabling statutes scattered throughout the Maryland Code.[11] The powers that have been expressly granted

---

[9] The "local law" limitation imposed by Md. Const. art. XI-F, § 3 and Article 25B poses little difficulty here. Your letter indicates that the County seeks only to regulate bylaws, dues assessments, and reserve funds for HOA communities within the County, and the Court of Appeals has held that ordinances bearing on the use and ownership of land within a county are "local" in nature. *See, e.g.*, *Steuart Petroleum Co. v. Bd. of County Comm'rs*, 276 Md. 435, 446 (1975) ("[N]othing could be more local in scope than legislation affecting land use in a single county, irrespective of the fact that it could be contended that adjacent counties were indirectly affected."); *Fish Mkt. Nominee Corp. v. G.A.A., Inc.*, 337 Md. 1, 12 (1994) ("The fact that Baltimore City's redemption interest rate ordinance affects a non-resident owner or purchaser of real estate does not make the ordinance general in scope. It applies to tax sales of property only within Baltimore City and is, therefore, local."). For a review of the cases on what constitutes a "local law," see *Kent Island Def. League*, 145 Md. App. at 693-94.

[10] Md. Ann. Code art. 25B (2011 Repl. Vol., 2012 Supp.). Effective October 1, 2013, Article 25B, among other provisions on local government powers, will be recodified into the new Local Government Article. 2013 Md. Laws, ch. 119.

[11] For a thorough history of Article XI-F, see 62 *Opinions of the Attorney General* 275 (1977). There, then-Attorney General Burch identified a "fundamental constitutional ambiguity" in Article XI-F as to the scope of a code county's authority, *id.* at 299, and tentatively concluded that Article XI-F probably granted them the power to "legislate on all matters of local concern." *Id.* at 290. Subsequent cases, however, have suggested that the powers of code counties are more limited. *See Miller v. Pinto*, 305 Md. at 404; *see also East Star, LLC v. County Comm'rs of Queen Anne's County*, 203 Md. App. 477,

to the counties are supplemented by the implied authority to exercise "such powers as are necessary in the performance of a duty imposed or the accomplishment of a stated purpose . . . ." *Barlow*, 276 Md. at 95.

The counties' powers—express and implied—are limited by the doctrine of preemption. Under that three-part doctrine, "legislative acts by a local jurisdiction that conflict with a public general law or that deal with an area in which the General Assembly has occupied the entire field or which deal with an area that the General Assembly has expressly reserved to itself, are invalid." *Kent Island Def. League*, 145 Md. App. at 689 (citing *County Council for Montgomery County v. Montgomery Ass'n*, 274 Md. 52, 59 (1975)).

Not all State legislative enactments have preemptive effect; the General Assembly sometimes legislates in a field without occupying it or reserving exclusive power over it. In that event, a local jurisdiction may exercise its powers concurrently if its enactments merely supplement the State law. *See County Council for Montgomery County*, 274 Md. at 59; *see also Coalition for Open Doors*, 333 Md. at 380 ("When a state law simply excludes a particular activity from its coverage, our cases have not attributed to the General Assembly an intent to preempt local legislation regulating or prohibiting that activity. Instead, in such situations supplementary local legislation has not been deemed to be in conflict with and preempted by the state statute.").

We will look to the Maryland Code for express or implied grants of authority to the code counties to enact laws such as those proposed by the County and then to the HOA Act and the Corporations Article for express or implied preemptions of such grants.

492 n.13 (2012) (noting that the General Assembly withheld the broad police power from code counties but granted them the authority to exercise it in discrete areas).

### B. *Whether the State has Granted to a Code County the Authority to Condition the Approval of an HOA Project on the County's Approval of the HOA Bylaw*

The HOA Act itself does not expressly authorize local governments to regulate the contents of HOA bylaws as a means of preventing HOA failures. Nonetheless, we think that several other State statutes provide the County with permitting and other powers that impliedly include the authority, and sometimes the duty, to require that new HOAs be structured in ways that will enable them to continuously fulfill their maintenance obligations.

We begin with two State environmental statutes that require counties to evaluate, at the time of permitting, the likelihood that certain commonly-owned facilities and resources will be maintained. We then survey the land use statutes that authorize the counties to perform such an evaluation. Because these statutes, in our view, provide the County with sufficient authorization to address the problems you discuss, we do not reach the question of whether the County may additionally enact consumer protection measures.

### 1. The Stormwater Management Act of 2007

The Stormwater Management Act was enacted to "reduce as nearly as possible the adverse effects of stormwater runoff and to safeguard life, limb, property, and public welfare." Md. Code Ann., Envir. ("EN") § 4-201 (2007 Repl. Vol., 2012 Supp.). The Stormwater Management Act itself does not specify how stormwater is to be managed; instead, it requires counties to establish and implement stormwater management programs ("local programs") in accordance with the rules and regulations issued by the Department of the Environment ("MDE"). *See* EN § 4-202 (requiring counties to "adopt ordinances necessary to implement a stormwater management program" and requiring local programs to "meet the requirements established by [MDE] under § 4-203"). The Stormwater Management Act, directly and through MDE's regulations, covers all stages of stormwater management, from permitting through enforcement. EN §§ 4-201–4-215; COMAR 26.17.02. As your questions relate to *prospective* HOA developments, we do not address the enforcement provisions of the Stormwater Management Act and how they may be used to improve HOA maintenance of existing facilities; we address only those permitting requirements relevant to a newly-formed HOA's ability to maintain its stormwater management facilities.

Under the Stormwater Management Act, each local program must require that a person submit a stormwater management plan to the appropriate local permitting authority, and secure approval of that plan, before developing land for residential and certain other uses. EN § 4-204(a).[12] That is, a local government may not issue building and grading permits to a developer of land subject to the Stormwater Management Act unless the locally-designated stormwater-permitting authority has approved the developer's plan. EN § 4-204(a) and (c); *see also* COMAR 26.17.02.05. One of the permitting criteria set by the Stormwater Management Act is the likelihood that the proposed stormwater practice will be adequately maintained. Under EN § 4-203(b)(7), MDE must adopt rules and regulations that, among other things, "[s]pecify the minimum requirements for inspection and maintenance of stormwater practices." MDE has duly required by regulation that the owner/developer "perform or cause to be performed preventive maintenance of all completed [environmental site design] treatment practices and structural stormwater management measures to ensure proper functioning." COMAR 26.17.02.11A. Moreover, local ordinances must contain that requirement. *Id*.

MDE has also addressed maintenance requirements in its Stormwater Design Manual, which is incorporated by reference into COMAR 26.17.02.01-1B. *See* Md. Code Ann., State Gov't § 7-207 (providing for incorporation by reference); *see also* 79 *Opinions of the Attorney General* 322 (1994) ("Maryland law permits incorporation by reference" into COMAR and an incorporated document "fully becomes a part of COMAR . . . ."); 73 *Opinions of the Attorney General* 3 (1988) (sediment and erosion control handbook appropriately incorporated by reference into COMAR). The Design Manual sets overall performance standards "that must be met at development sites" and that "shall be addressed at all sites where stormwater management is required[.]" MDE, *Maryland Stormwater Design Manual* § 1.2 at 1.13 (2000, Supp. 1).[13] Standard No. 9 requires that "[a]ll stormwater management practices shall have an enforceable

---

[12] For summaries of the Stormwater Management Act, see 96 *Opinions of the Attorney General* 61, 62-63 (2011), and 91 *Opinions of the Attorney General* 152 (2006).

[13] The Maryland Stormwater Design Manual, the Maryland Model Stormwater Management Ordinance, and other stormwater-related materials are available online through the "publications list" on the MDE website, http://www.mde.state.md.us/programs/Water/Storm waterManagementProgram.

operation and maintenance agreement to ensure the system functions as designed." *Id*. at 1.14. To that end, designers must "[e]nsure that the BMP [best management practice] selected meets specific performance criteria with respect to feasibility, conveyance, pretreatment, treatment, landscaping and maintenance." *Id*., § 1.5 at 1.19. For example, Appendix A, which addresses the landscaping of BMPs, instructs the designer to "carefully consider the long-term vegetation management strategy for the BMP, keeping in mind the 'maintenance' legacy for the future owners. . . . Make sure the facility maintenance agreement includes requirements to ensure vegetation cover in perpetuity." *Id.* at A-3. And, under Standard No. 5, structural BMPs used for new development (*e.g.*, stormwater ponds) must remove certain percentages of suspended solids and phosphorus. *Id*., § 1.2 at 1.13. The standard "presume[s] that a BMP complies with this performance standard" if the BMP is sized, designed, and constructed properly and "maintained regularly." *Id.* These performance standards make clear that a local permitting authority may not approve the stormwater management practices proposed for an HOA subdivision without first determining and acknowledging the sufficiency of future maintenance plans.

MDE has prepared a Model Stormwater Management Ordinance that offers guidance regarding the "minimum criteria" for local stormwater management programs. MDE, *Maryland Model Stormwater Management Ordinance* (June 2009, April 2010 Supp.). The Model Ordinance elaborates on the developer's maintenance obligations under the performance standards:

> 9.2 Maintenance Agreement
>
> A. Prior to the issuance of any building permit for which stormwater management is required, (local agency) shall require the applicant or owner to execute an inspection and maintenance agreement binding on all subsequent owners of land served by a private stormwater management facility. Such agreement shall provide for access to the facility at reasonable times for regular inspections by (local agency) or its authorized representative to ensure that the facility is maintained in proper working condition to meet design standards.

\* \* \*

9.3 Maintenance Responsibility

A. The owner of a property that contains private stormwater management facilities installed pursuant to this Ordinance, or any other person or agent in control of such property, shall maintain in good condition and promptly repair and restore all [environmental site design] practices, grade surfaces, walls, drains, dams and structures, vegetation, erosion and sediment control measures, and other protective devices in perpetuity. Such repairs or restoration and maintenance shall be in accordance with previously approved or newly submitted plans.

B. A maintenance schedule shall be developed for the life of any structural stormwater management facility or system of [environmental site design] practices and shall state the maintenance to be completed, the time period for completion, and the responsible party what will perform the maintenance. This maintenance schedule shall be printed on the approved stormwater management plan.

*Id.* at 31-32. In sum, the Stormwater Management Act requires a local permitting authority to determine whether the operation and maintenance agreement and other maintenance arrangements proposed by the developer are sufficient to assure the viability of stormwater management "in perpetuity" for non-structural stormwater practices, and "for the life" of any structural stormwater management facility. *Id.*

In our opinion, an "enforceable operation and maintenance agreement" for purposes of Standard No. 9 is an agreement with an entity that is structured in a way that ensures the entity's continued ability to perform the agreed-upon obligations. We thus interpret the Stormwater Management Act as authorizing the County to withhold a permit until the applicant has demonstrated that the proposed HOA will have that ability. The County's "approval" of a developer's plan for the maintenance of an HOA development, as the term "approval" is defined by MDE, means that the County has "determine[d] and acknowledge[d] the sufficiency of submitted materials to meet the requirements" set

by the maintenance standard and has not merely "received [them] for review." *See* MDE, *Model Stormwater Management Ordinance*, at 2. Given the County's stated belief that the chronic failure of HOAs to maintain their stormwater management practices is largely due to poorly-drafted bylaws, we think the County has the implied power, and likely the duty, to address those deficiencies in its stormwater program, subject to the limits we discuss in Part C below.[14]

As a practical matter, the County's regulation of HOA governance for stormwater management purposes would likely spill over to an HOA's management of its other facilities; we doubt that developers of HOA communities would establish one method of governance for the purpose of stormwater management and another for general governance issues. Nonetheless, in the unlikely event that a new HOA subdivision would lack stormwater facilities to maintain, we discuss other State laws that, in our opinion, impliedly confer similar powers on local governments.

## 2. The Forest Conservation Act

The Forest Conservation Act, like the Stormwater Management Act, requires local governments that have planning and zoning authority to develop a local program in accordance with State standards. *See* Md. Code Ann., Nat. Res. ("NR") § 5-1603(a) (2012 Rep. Vol.); *see also* 77 *Opinions of the Attorney General* 127 (1992) (discussing the Forest Conservation Act

---

[14] St. Mary's County, for example, has supplemented MDE's model ordinance language by requiring that the "Inspection and Maintenance Agreement binding on all subsequent owners of land served by the private stormwater facility . . . shall provide . . . for regular or special assessments of property owners to ensure that the facility is maintained in proper working condition . . . ." St. Mary's County Stormwater Management, Grading, Erosion, and Sediment Control Ordinance § 3.14(1) (May 28, 2103). Because the interpretation of Charles County's laws is for the County in the first instance, we have not examined whether Charles County's various stormwater ordinances already provide it with a mechanism for addressing HOA governance, but we note that some may. *See*, *e.g.*, Stormwater Management Ordinance § 9.6 (Aug. 1, 2010) (requiring that stormwater management systems be "protected by public or private easements or private inspection and maintenance agreements"); Storm Drainage Ordinance § 13.0 (Aug. 1, 2010) (providing for the County's approval of maintenance agreements for on-site storm drainage practices).

mandates). When the Forest Conservation Act applies to a project, the applicant must submit a forest stand delineation, and then a forest conservation plan, to the local authority. NR §§ 5-1602, 5-1604, 5-1605. The local authority may not approve the applicant's subdivision plan, and may not grant a grading or sediment control permit for the project, until the forest conservation plan has been approved. NR § 5-1608(b).

The Forest Conservation Act establishes the maintenance of the resource as a permitting criterion. Among the items an applicant must include in the proposed forest conservation plan is "[a] binding 2-year management agreement that details how the areas designated for afforestation or reforestation will be maintained to ensure protection or satisfactory establishment including: (i)[w]atering; and (ii) [r]einforcement planting provisions if survival falls below required standards . . . ." NR § 5-1605(c)(9). The Forest Conservation Act also requires the applicant to include "[a]ny other requirement established in regulations adopted by the Department [of Natural Resources], or imposed by a local authority." NR § 5-1605(c)(10). One such requirement is a bond to assure the performance of the two-year agreement. *See* COMAR 08.19.05.01.

Although the Forest Conservation Act is less forceful and less focused on long-range maintenance issues than the Stormwater Management Act, we think the same results apply: The legislative mandate to local governments to implement these programs includes the implied authority (or duty) to approve only those maintenance agreements that are reasonably capable of performance of the two-year agreement or other requirements set by DNR.

### 3. The Discretionary Powers Granted by Article 25A, § 5(T), (W), and (X), via Article 25B, § 13

Article 25B—by reference to provisions of Article 25A—grants to code counties the authority to enact measures in numerous areas, three of which are relevant to your questions about the County's authority to address the problem of poorly-maintained facilities in HOA developments. *See* Art. 25B, § 13.[15]

---

[15] Article 25B, § 13 grants to code counties 29 of the 32 categories of enumerated "express powers" granted to charter counties by Article 25A, § 5. The Article 25A, § 5(S) power, described as the "broad governing power, the so-called police power," *Waters Landing Partnership v. Montgomery County*, 337 Md. 15, 19 (1994), is among

First, Article 25A, § 5(T) authorizes code counties to exercise police powers over streets and other facilities that might be owned by an HOA. Under Article 25A, § 5(T), a code county may:

> enact local laws enabling the county council to adopt from time to time . . . ordinances and amendments thereof for the protection and promotion of public safety, health, morals, comfort and welfare, relating to any of the following: the location, construction, repair, and use of streets and highways; the disposal of wastes; the control of problems of soil erosion and of the preservation of the natural topography in newly developed and other areas; and the erection, construction, repair and use of buildings and other structures . . . .

A code county's § 5(T) powers extend to facilities that a developer has not dedicated to a county and include the power to condition the construction of those facilities on reasonable terms. *See County Council for Montgomery County v. Lee*, 219 Md. 209, 215 (1959) (stating that a charter county's power under Article 25A, § 5(T) over streets extended to the private street planned for a subdivision and "carries with it the right to prescribe reasonable terms and conditions upon which the permit would issue"); *see also* 79 *Opinions of the Attorney General* 90, 93 (1994) (citing *Lee* and concluding that Article 25A, § 5(T) authorized a county to regulate construction of a road that the developer intended to convey to an HOA). Here, we similarly conclude that Article 25A, § 5(T) gives code counties broad powers to enact laws permitting the imposition of reasonable conditions designed to assure the ability of an HOA to perform ongoing "repair" of the HOA's commonly-owned streets, buildings, and other structures. Implied in this grant of power, like those reviewed above, is the authority of a code county to deny a permit for a facility that is to be assigned to an entity that, in the county's experience, will probably be unable to maintain it. Again, the County's measures must be consistent with the HOA Act and Corporations Article provisions applicable to HOA governance, as discussed in Section C below.

---

the powers withheld from code counties. *See* Art. 25B, § 13; *see also East Star*, 203 Md. App. at 492 n.13. The General Assembly has instead granted to code counties the authority to exercise police powers in specific fields.

Second, Article 25A, § 5(W) authorizes code counties to "enact local laws providing for . . . the financing, construction and maintenance of storm drainage projects, and the regulation of storm drainage facilities." That discretionary power has been mostly, if not entirely, supplanted by the Stormwater Management Act mandate, but it is worth noting for its confirmation of a code county's authority to enact laws "providing for" maintenance.

Third, Article 25A, § 5(X) grants to code counties broad police powers in the areas of "zoning and planning." Charles County, however, has chosen to adopt its land use ordinances under the authority granted by Article 66B, now codified in the Land Use Article. *See* County Code § 278-3. We will therefore review the provisions in the Land Use Article that apply to non-charter counties and municipalities in relation to the question posed by the County.[16]

### 4. The Land Use Article Powers

The Land Use Article expresses "the policy of the State" that "planning and zoning controls shall be implemented by local government," Md. Code Ann., Land Use ("LU") § 4-101(a)(2), and spells out the types of controls that local governments variously may or must adopt and implement. As relevant here,

---

[16] As Charles County did not choose Article 25A as the source of its land use powers, we do not address the Land Use Article provisions applicable only to charter counties. The Article 25A powers remain available to Charles County, however, should it wish to adopt them. *See Miller*, 305 Md. at 403 n.4 (observing that, even though a county chooses Article 66B as the source of its land use powers, the "permissive language" § 13 of Article 25B—"'a county . . . *may* exercise' the powers provided by this section (emphasis added)"—"leaves to the discretion of the local legislative body the choice as to which, if any, of these powers will be vested in the board of appeals"). However, the County's designation of Article 66B as the source of its land use powers has ramifications under the Land Use Article, which differentiates between charter and non-charter counties for some purposes and treats as charter counties those code counties that exercise Article 25A land use powers. *See* Md. Code Ann., Land Use § 1-402(b) ("[A] code county that chooses to exercise the powers relating to land use stated in Article 25A of the Code shall be treated as a charter county for purposes of § 1-401 of this subtitle."); *see also id.*, § 1-401(b) (specifying the provisions applicable to charter counties). For purposes of this opinion, we will refer to those code counties that exercise Article 66B land use powers—like Charles County—as "non-charter" counties.

the local governments' planning and zoning authority includes broad powers to execute various State-mandated goals through planning mechanisms such as subdivision regulations and a more specific power to provide for adequate public facilities. We begin with the broad planning powers.

*Planning Powers*

The Land Use Article variously requires and allows counties to exercise powers that bear on the County's wish to further the viability of new HOAs by regulating their bylaws. Those powers are mostly to be exercised through the adoption of a comprehensive land use plan and regulations to implement that plan. *See Maryland-National Capital Park & Planning Comm'n v. Greater Baden-Aquasco Citizens Ass'n*, 412 Md. 73, 87 (2009) ("The county is charged with ensuring the implementation of the comprehensive plan through zoning and other land use regulations, including subdivision ordinances and regulations.").

The Land Use Article contains numerous mandates as to the contents of comprehensive plans. Several of those mandates are relevant to the County's stated concern that HOAs be structured so as to be self-sustaining and capable of maintaining the commonly-owned facilities. Under LU § 3-101, non-charter counties must "enact, adopt, amend, and execute" a comprehensive plan that must contain the twelve "visions" specified in LU § 1-201(1)-(12), *see* LU § 3-204(a), and serve as the document through which the planning commission "shall implement" those visions. LU § 1-201.[17] Vision (1) states that "a high quality of life is achieved through universal stewardship of the land . . . resulting in sustainable communities and protection of the environment." LU § 1-201. Vision (9) states that "land and water resources . . . are carefully managed to restore and maintain healthy air and water, natural systems, and living resources," and Vision (10) states that "waterways, forests . . . [and] natural systems . . . are conserved." LU § 1-201(9), (10). The Land Use Article further requires that the "implementation" of the visions be "achieved through the adoption of applicable . . . subdivision ordinances and regulations . . . ." LU § 3-303(b).

---

[17] In the Preamble to the Smart and Sustainable Growth Act of 2009, the General Assembly stated its "intent . . . that comprehensive plans should be followed as closely as possible while not being elevated to the status of an ordinance and that deviations from the plan should be rare . . . ." *Id*. A local jurisdiction may give a plan the status of an ordinance by adopting a law to that effect. *HNS Development, LLC v. People's Counsel*, 425 Md. 436, 457-58 (2011).

The County has duly adopted a comprehensive plan. In accordance with the requirements stated above, the 2006 Charles County Comprehensive Plan (now being revised) states this Growth Management Land Use Planning Policy:

> Continue to implement regulations, including the adequate public facilities ordinance, that require that the costs of adequately servicing proposed developments be clearly defined and that require that the funds for meeting and maintaining these developments are provided without unrelated financial burden on current residents or public agencies.

*Charles County Comprehensive Plan*, 3-2. The Plan also states that a "[g]oal[] and [o]bjective[]" of its natural resources element is to "[c]ontinue and improve programs and policies to assure the functional maintenance of stormwater management systems." *Id*. at 8-2, 8-3. In light of the County's experience that poorly drafted quorum requirements and poor HOA management lead to the deterioration of HOA-owned facilities and then to requests for County assistance, we think that the County's statutory obligation to implement the environmental and sustainable communities visions includes the authority to implement its Growth Management Policy by enacting HOA governance and measures that supplement the HOA Act.

It appears to us that the County has already adopted regulations that enable it to review a proposed HOA's governance in the subdivision application process. *See generally* County Code §§ 278-58 through 278-66. Specifically, § 278-63 provides that the developer must certify that the HOA "shall be devised to ensure the successful fulfillment of [its] maintenance, preservation and improvement responsibilities . . . ." In a November 8, 2012 letter to us, however, the County Attorney's Office opined that § 278-63 is insufficient because, as interpreted by the County, it does not require a developer to submit bylaws and other documents to the County for its review and approval. In the absence of such review and approval, the County Attorney's Office reasoned, the developer's certification that the HOA will be able to fulfill its responsibilities "does not necessarily make it so."

We believe that County Code § 278-63, when read in the context of State law, gives the County the authority to request and examine HOA bylaws that bear on the criteria for subdivision approvals. The Court of Appeals has instructed that the burden

lies with the developer "to establish facts necessary to obtain approval for its proposed subdivision." *Grasslands Plantation, Inc. v. Frizz-King Enters*., 410 Md. 191, 230 (2009). In determining whether a developer has carried its burden, the County need not accept unquestioningly the developer's certification; as a general principle of administrative law, the permitting agency's "[f]indings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions." *Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530, 553 (1999). The County's administration of § 278-63 thus could, and likely should, include an examination of the bylaws and other facts underlying a developer's conclusory certification that the HOA for a proposed development has been "devised to ensure [its] fulfillment" of the HOA's maintenance obligations. In short, the County may require a developer to submit facts that establish the viability of an HOA to which the developer proposes to assign the responsibility for maintaining community infrastructure.

In our view, County Code § 278-45C also likely provides the County with a mechanism by which to review and approve HOA bylaws. That regulation requires developers to provide for "the proper and continuous maintenance" of commonly-owned areas "by legal arrangements incorporated into the deed restrictions and . . . acceptable to the County Commissioners . . . ." The County Attorney's Office indicated to us that "deed restrictions typically only control what a landowner can do with his property" and are not a means of "alter[ing] the governance of [common ownership communities] or the accountability of developers and Boards of Directors." We believe that, as a matter of State law, minimum bylaw standards may be included in a deed as "deed restrictions" so long as they impose a burden on ownership that runs with the land. And, we see no reason why such restrictions, properly worded, would not satisfy the necessary elements for doing so. *See*, *e.g.*, *Charles County Comm'rs v. St. Charles Assocs*., 366 Md. 426, 448-50 (2001); *Bright v. Lake Linganore Ass'n*, 104 Md. App. 394 (1995) (setting out the elements of covenants that run with the land).

*Adequate Public Facilities Ordinance ("APFO") Powers*

The adequate public facilities provisions of the Land Use Article also provide code counties with the implied authority to review a developer's arrangements for the maintenance of infrastructure, such as streets and stormwater facilities, proposed for HOA ownership. Under LU § 7-101, a county "may enact, and is encouraged to enact," local laws "to facilitate orderly

development and growth." Those local laws may provide, among other things, for "the planning, staging, or provision of adequate public facilities," and "alternative subdivision requirements that . . . reduce infrastructure costs." LU § 7-101(1), (7)(ii). The subtitle expressly does not "limit a local jurisdiction's authority to . . . adopt other methods to . . . facilitate orderly development and growth." LU § 7-103.

As explained by the Court of Appeals, the adequacy of the infrastructure needed to support a private development has an impact on a local jurisdiction's ability to plan for orderly growth:

> How can a county effectively plan for capital expenditures for roads, schools, sewers, and water facilities if, without regard to preexisting plans, a developer, as proposed here, might place a settlement of 1,200 or more people in the middle of a previously undeveloped area, a settlement which would overtax school facilities and which would necessitate improvement of a road whose reconstruction had not been contemplated before 1990? Planning would be futile in such situations.

> In those instances the developer, not the constituted authority of the county, is in control of planning for the future of the county. Surely, this was not contemplated by the General Assembly when relative to the master plan it repeatedly used the words "at specified times as far into the future as is reasonable" and then went on to mandate approval of the master plan by the local legislative body and to require the adoption of subdivision regulations.

*Bd. of County Comm'rs of Cecil County v. Gaster*, 285 Md. 233, 248-49 (1979). Accordingly, developers may not impose infrastructure construction and maintenance costs on the local jurisdiction without the jurisdiction's acceptance of the facility. "[T]he purpose of requiring an acceptance by the local government is to prevent a situation where a developer imposes upon the municipality the responsibility for maintenance and repair for an otherwise private facility merely by designating unilaterally the improvement for public maintenance." *People's*

*Counsel for Balt. County v. Surina*, 400 Md. 662, 714 (2007) (citing *City of Annapolis v. Waterman*, 357 Md. 484, 504 (2000)).

The same principle supports the County's ability to review the substance of the developer's HOA arrangements. If the County did not have that ability, the developer would effectively control, through the sufficiency of those arrangements, whether the County ultimately becomes responsible for the maintenance of unplanned-for infrastructure. This is precisely the outcome that the Court of Appeals warned against in *Gaster* and *Surina*. We believe it unlikely, therefore, that a reviewing court would adopt the narrow construction of the County's authority, and County Code § 278-63 in particular, that the County has suggested. In our view, the authority granted by the APFO provisions of the Land Use Article may be implemented by measures designed to ensure that the facilities load that the County "sheds" to a developer, and thence to a HOA, stays with that entity.[18]

## C. The Preemption Issues

The next question is whether either the HOA Act or the Corporations Article provisions on nonstock corporations preempt the powers identified above.[19] Some of those powers are very specific and more akin to duties—for example, county stormwater programs must adhere to the standard that "[a]ll stormwater management practices shall have an enforceable operation and maintenance agreement to ensure the system functions as

---

[18] We do not mean to suggest that HOA-owned facilities are "public facilities" for purposes of LU § 7-104(b), which imposes certain reporting requirements on local governments. We merely state that a county's planning power over the adequacy of the public facilities that the county decides to provide logically includes the power to evaluate the adequacy of the facilities to be provided by the HOA developer. "Public" facilities for reporting purposes would include such facilities as streets, when dedicated to the County, *see Waterman*, 357 Md. at 504 n.8, and public schools. *See, e.g., Anselmo v. Mayor of Rockville*, 196 Md. App. 115 (2010).

[19] Charles County is not the only county with concerns about the possible preemptive effect of the HOA Act on its regulation of HOA subdivisions. Queen Anne's County addresses that possibility in its subdivision regulations with the following provision: "Modification. The provisions of this Chapter 18:1 that require covenants shall be waived or modified by the Planning Commission to the extent, if any, to which they are prohibited by the Maryland Homeowners Association Act . . . ." Public Local Laws of Queen Anne's County § 18:1-204B (2006).

designed," *Maryland Stormwater Design Manual* at 1.14—while others, such as those embodied in the "Visions" in the Land Use Article, are more abstract. Still, in our view, each of these implied powers survives scrutiny under the Court's three-step preemption analysis. *See Altadis U.S.A.*, *Inc. v. Prince George's County*, 431 Md. 307, 311 (2013) ("Maryland state law may preempt local law in one of three ways: 1. preemption by conflict, 2. express preemption, or 3. implied preemption.")(footnotes omitted).

## 1. Express Preemption

"Express preemption occurs when the General Assembly prohibits local legislation in a field by specific language in a statute." *Maryland Reclamation Assocs. v. Harford County*, 414 Md. 1, 36 (2010)(internal quotation marks omitted). Although the Corporations Article does not explicitly preclude local regulation of bylaw provisions, two provisions of the HOA Act arguably do.

First, RP § 11B-104(b)(3) provides that local governments may not "[p]rovide that the disclosures required by § 11B-105, § 11B-106, or § 11B-107 of this title be registered or otherwise subject to the approval of any governmental agency." Taken out of context, the meaning of this provision may be difficult to discern: the subsection might broadly bar the County from requiring its approval of the *content* of the required disclosures, which include HOA bylaws, or it might simply bar the County from regulating the disclosure *process* required of developers who are selling a lot to a purchaser. This potential ambiguity, however, recedes when the provisions are considered in their proper context, as they must be. *See Bourgeois v. Live Nation Entm't*, 430 Md. 14, 27 (2013) (requiring that each provision be interpreted "in the context of the entire statutory scheme" and that "statutes on the same subject . . . be read together and harmonized, to the extent possible"). The statutory scheme of the HOA Act, especially when harmonized with the statutes that govern the subdivision permitting process, shows that the HOA disclosure provisions address the relationships among developers, homeowners, and HOAs during and after the time a lot is sold, but do not apply during the subdivision permitting stages, when the lot itself is approved. We note in this respect that the HOA Act presupposes the existence of an HOA, a "lot," and a "purchaser," *see*, *e.g.*, RP §§ 11B-102, 11B-105, all of which emerge only after the subdivision permitting process is complete.

We also note that the many disclosures that a developer must provide under RP §§ 11B-105 through 11B-107 include not only bylaws, but also "all recorded . . . restrictions." RP § 11B-

105(b)(6)(i).  As discussed above, local governments variously must and may exercise their land use and environmental powers to require the developer to agree to restrictions, and many restrictions are recorded before the subdivision can proceed.  For example, developers of HOA projects must usually enter into a stormwater facility maintenance agreement "binding on all subsequent owners of [the] land served." *See Model Stormwater Management Ordinance* § 9.2.  Such restrictions imposed during the subdivision application process are necessarily "subject to the approval" of the permitting agency before the subdivision may proceed.  So, when read in the context of the HOA Act as a whole—which targets conduct during and after the time of sale— and in harmony with the State laws that local governments must follow when approving the subdivision of the land into lots, the meaning of RP § 11B-104(b)(3) becomes clear:  Its provisions address the disclosure process at the time a lot is sold and do not limit the County's review and "approval" of the contents of the documents during the subdivision review process.  Indeed, RP § 11B-104(a) keeps in "full force and effect" local provisions on "building codes or zoning."  *See also* LU § 4-101(a)(2) (expressing the State policy that "planning and zoning controls shall be implemented by local government").

To confirm our conclusion that RP § 11B-104(b)(3) does not prohibit a local government from reviewing HOA bylaws during the subdivision process, we look to the legislative history of the HOA.  *See Bourgeois*, 430 Md. at 27 ("Legislative history may be considered in an effort both to confirm what appears to be a clear intent from the language itself and to discern legislative intent when that intent is not entirely clear from the statutory language").  The HOA Act, enacted as Chapter 321 of the Laws of Maryland 1987, was substantially similar to a bill that had been introduced in 1985 at the request of the Governor's Commission on Condominiums, Cooperatives, and Homeowners Associations. *See* 72 *Opinions of the Attorney General* at 160 (discussing the history of the HOA Act).  The Commission described the disclosure requirements as "self-enforcing consumer protections" directed at "solv[ing] the problem of disclosure now faced by consumers" and explained that, in its view, a requirement that HOAs register with the State would place a "workload . . . on the State" and "would be overly burdensome."  1985 Final Report at 11.  It is likely, then, that the limitation on a local government's authority to require registration and approval of "disclosures" was intended simply to address a concern that approval and registration at the time of sale would be "overly burdensome." More generally, the Summary of the Senate Judicial Proceedings

Committee Report on the bill that became the HOA Act stated that "[t]he legislative intent of Senate Bill 96 is to create the [HOA Act] which will govern contracts of sale for lots in a development that is subject to a homeowners association." None of this history suggests a legislative intent to address the subdivision process. In our view, RP § 11B-104(b)(3) simply regulates the dis-closure mechanism applicable to a consumer's purchase; it does not apply to a county's earlier review of documents pertinent to the criteria set in its subdivision regulations. Moreover, the consumer-protection purposes of the HOA Act would not be served by requiring the County to issue permits for HOA developments to be maintained by entities that the County believes will not function.

The second HOA provision that might preempt local regulation of bylaws is RP § 11B-104(b)(1). It provides that a local government may not "[i]mpose a burden or restriction on property which is part of a development because it is part of a development . . . ." We have explained that, under the HOA, Condominium, and Cooperative Housing Acts, "if common ownership property presents a problem, but so too do other comparable forms of property, a local jurisdiction may not impose the cost of a solution on the particular common ownership property alone." 75 *Opinions of the Attorney General* 103, 108 (1990) (citing *Rockville Grosvenor, Inc. v. Montgomery County*, 289 Md. 74 (1980)). "In other words," we stated, "the General Assembly has reserved to itself the power to decide whether, in pursuit of some policy objective, the developers or owners of property in a condominium, cooperative, or homeowners association are to bear costs that other, similar situated property owners do not." *Id*. at 106. The Court in *Dumont Oaks Community Association v. Montgomery County* likewise concluded that a charter county's requirement that common ownership communities pay a per-unit registration fee to fund dispute resolution services did not violate the various prohibitions against local laws that impose different burdens on HOAs. 333 Md. 202, 210 (1993) (approving 75 *Opinions of the Attorney General* 103). The Court reasoned that the HOAs were being regulated "because they are common ownership communities, and not because they are homeowners associations," and so the ordinance was "concerned with a larger problem, and embrace[d] a larger class." *Id*. Here, the County would regulate an HOA's bylaws not because of the HOA's status as an HOA, but because the HOA owns, and must be able to maintain, a facility and resources in accordance with State and County regulations. In our

view, the County's regulation of HOA governing documents should not run afoul of RP § 11B-104(b)(1).

We conclude that the HOA Act does not expressly preempt the County's review and approval of the contents of governing documents such as bylaws.

## 2. Preemption by Conflict

Preemption by conflict occurs when a local ordinance "either prohibits an act that under State law is permitted, or it permits an act that under State law is prohibited." *Worton Creek Marina, LLC v. Claggett*, 381 Md. 499, 515 (2004). Courts will infer the Legislature's intent to displace local regulation either from "a verbal conflict" (*i.e.*, when the language of the State and local law are in conflict) or from a "functional conflict" (*i.e.*, when the impact of the local law interferes with the State law's function). *Mayor of Baltimore v. Hart*, 395 Md. 394, 408-09 (2006); *see also Coalition for Open Doors*, 333 Md. at 380 n.39.

As to a verbal conflict, the HOA Act regulates quorum and voting participation requirements only on discrete topics: child-care and home-based businesses, which an HOA may only prohibit upon the vote of a certain percentage of its members, *see* RP § 11B-111.1(d); the deletion of discriminatory covenants, also setting a minimum vote, *see* RP § 11B-113.3(b); and the amendment of governing documents, including bylaws, which must be approved by the affirmative vote of two-thirds of the votes in the development or "by a lower percentage if required in the governing document." *See* RP § 11B-116(b). The County has not proposed to regulate HOA actions on these discrete topics, and its proposal to lower voting participation requirements for HOA actions such as bylaws amendments would not conflict with RP § 11B-116(b), which merely sets a ceiling on the level of voting participation required for bylaws amendments.

As for an implied "functional" conflict, the overall functions of the HOA Act are to provide protections to buyers and prospective buyers of lots in HOA communities. The County's regulation of quorums and voting participation requirements for the purpose of preventing the failure of new HOAs would not interfere with these functions. The problems that you describe, as well as the commentary we have quoted above, support the proposition that measures to improve the functioning of HOAs in the County would instead have the incidental effect of supplementing the consumer protection measures in the HOA Act. *See Coalition for Open Doors*, 333 Md. at 380. In our view,

the County's implementation of its land use and environmental powers and duties by regulating HOA bylaws at the subdivision permitting stage would not conflict with the functions of the HOA Act.

Whether the County's proposed regulation of bylaws would conflict, either verbally or functionally, with the Corporations Article will depend on the particular measure and on whether the particular HOA is a nonstock corporation. Many of the Corporations Article provisions on bylaws for nonstock corporation either specify what bylaws "may" contain, *see*, *e.g.*, CA § 5-202(b) (permissible contents of charter or bylaws), or supply procedures to be followed in circumstances not addressed in a corporation's bylaws. *See*, *e.g.*, CA § 2-406 (removal of directors); *see also Lipitz v. Hurwitz*, 207 Md. App. 206, 224 (remarking on the "wide variety of ways" in which HOAs are structured), *cert. granted*, 429 Md. 528 (2012). A county government's local laws on those topics would likely not pose a verbal conflict with those permissive provisions.

Other provisions of the Corporations Article, however, set minimum requirements with which a local law may not conflict. For example, CA § 2-408(a), applicable to nonstock corporations via CA § 5-201, provides that "the action of a majority of directors present at a meeting at which a quorum is present is the action of the board of directors." Section 2-408(b)(1) defines a "quorum" as "a majority of the entire board," unless the bylaws "provide otherwise," but CA § 2-408(b)(2) sets forth minimums: A quorum must be at least one-third of the entire board, and if the board consists of only two or three directors, a quorum must be at least two. CA § 2-408(b). And, CA § 5-206 sets forth the procedures to be followed when "the number of members present at a properly called meeting of the members . . . is insufficient to approve a proposed action . . . ." CA § 5-206(a).[20] In that event,

---

[20] Section 2-506(a) of the Corporations Article provides:

(a) Unless this article or the charter of a corporation provides otherwise, at a meeting of stockholders:

(1) The presence in person or by proxy of stockholders entitled to cast a majority of all the votes entitled to be cast at the meeting constitutes a quorum; and

(2) A majority of all the votes cast at a meeting at which a quorum is present is sufficient to

the section provides, the action may be taken at a second meeting by a majority of those present in person or by proxy, provided that notice is given that describes the meeting and the manner in which voting will occur. CA § 5-206.[21]

So, while the Corporations Article does not expressly forbid the County from regulating the contents of bylaws of HOAs organized as nonstock corporations, it does contain minimum requirements that limit the County's authority to impose bylaw-related conditions on developers who propose to subdivide land for HOA developments.

### 3. Implied Preemption by Occupation of the Statutory Field

"A local law is preempted by implication when it deals with an area in which the [State] Legislature has acted with such force that an intent by the State to occupy the entire field must be implied." *Claggett*, 381 Md. at 512 n.6 (quoting *Talbot County v. Skipper*, 329 Md. 481, 488 (1993) (internal quotation marks omitted); *see also Altadis*, 431 Md. at 311-16 (collecting implied preemption cases). In *Ad + Soil, Inc. v. County Comm'rs of Queen Anne's County*, the Court of Appeals explained that "the primary indicia of a legislative purpose to pre-empt an entire field of law, absent express statutory language to this effect, is the comprehensiveness with which the General Assembly has legislated in the field." 307 Md. 307, 328 (1986). But when the state law "clearly contemplates a pervasive and vital role for local legislation in the field," *id*., the General Assembly obviously has not intended to reserve the field to itself.

---

approve any matter which properly comes before the meeting.

Section 5-202(b) also provides that, "[n]otwithstanding" § 5-202(a) or other provisions of the article, the charter or bylaws may "[p]rovide for the number or proportion of voting members whose presence in person or by proxy constitutes a quorum at any meeting of its members; . . . [and p]rovide that any action may be taken or authorized by any number or proportion of the votes of all its members or all its directors entitled to vote . . . ." CA § 5-202(b)(5), (6); *see* 76 *Opinions of the Attorney General* 105 (discussing the applicability of the Corporations Article to an incorporated community association).

[21] We note that those requirements, called to the attention of the existing HOAs that have ceased to function for lack of a quorum, might help solve some of the problems that you have mentioned.

Although the HOA Act and Corporations Article collectively contain enough provisions applicable to HOA governance to raise the question of implied preemption, we conclude that the two statutes do not evidence a legislative intent to occupy the entire statutory field of HOA governance. The HOA Act regulates governance matters such as voting participation and meetings procedures on only a few discrete topics, and, otherwise, provides for a petition to circuit court for the appointment of a receiver when, after notice, the HOA "fails to fill vacancies on the governing body sufficient to constitute a quorum in accordance with the bylaws . . . ." RP § 11B-111.5(a). These provisions are not comprehensive; they leave gaps as to the actual content of the bylaws.

The Corporations Article fills some of those gaps, but not all. It, too, gives the drafter of the charter or bylaws the leeway to devise provisions on many subjects, albeit within limits such as those discussed above. *See* CA § 2-506(a). Meanwhile, the Stormwater Management Act expressly contemplates, and requires, that counties will play a regulatory role that is sufficiently "pervasive and vital," *Ad + Soil*, 307 Md. at 328, to weigh against preemption. The Forest Conservation Act, which requires counties to implement its provisions, and Article 25A and the Land Use Article, which provide for local regulation of infrastructure and local implementation of land use policies, likewise contemplate a strong local role. In our view, these statutes impliedly authorize the County to require developers to fill the gaps left by the HOA Act and the Corporations Article with bylaw and charter provisions that will promote HOAs' ability to perform their maintenance agreements and other governance functions.

In sum, local governments may set such bylaw standards as they deem necessary to assure an HOA's ability to comply with measures adopted by the County under the mandates and enabling statutes that we have discussed so long as those standards meet the minimum requirements set by the HOA Act and Corporations Article. And, if a local government regulates HOA bylaw provisions as a means of ensuring compliance with maintenance standards, we do not think the regulations would be barred by RP § 11B-104(b)(1), which precludes local governments from imposing burdens on HOA developments because of their status as HOA developments.[22]

---

[22] Your memorandum concludes that the County could regulate HOA governance so long as it enacted similar provisions regarding

### D. Financial Issues

Lastly, you ask generally about the County's authority to require developers to create larger reserve funds for HOAs and pay HOA assessments for unsold lots so as to assure an HOA's ability to maintain the commonly-owned facilities. We believe that the imposition of additional financial requirements would be permissible under many of the land use and environmental powers we have discussed above. It is well-established that the exercise of a county's land use powers, for example, may be conditioned on the payment of various types of expenses occasioned by land development. Such conditions are commonly referred to as "exactions," which have been broadly defined as any "condition[s] which must be complied with before some advantage such as recordation or lot subdivision is allowed." *Village Square No. 1*, *Inc. v. Crow-Frederick Retail Ltd. P'hip*, 77 Md. App. 552, 561 (1989); *see Waterman*, 357 Md. at 523-24 (listing as examples of exactions cases in which monetary conditions were imposed on a developer).[23]

As recently held by the United States Supreme Court, the government may impose a monetary exaction when "there is a 'nexus' and 'rough proportionality' between the government's demand and the effects of the proposed land use." *Koontz v. St.*

---

condominium and cooperative associations. We caution that the statutes that govern those associations regulate them in ways not contained in the HOA Act, and that preemption is more likely. For a discussion of the preemption provisions in the Condominium Act, RP §§ 11-101 *et seq.*, see 67 *Opinions of the Attorney General* 13 (1982), and its appendix, a bill review letter concerning the 1983 amendments to that law. *See also Dumont Oaks*, 333 Md. at 205-11; 90 *Opinions of the Attorney General* 35-36 (2005) (describing the Condominium Act generally). In some cases, condominiums organized under the Condominium Act and cooperatives organized under CA §§ 5-6B-01 *et seq.* are also subject to the HOA Act. *See* 73 *Opinions of the Attorney General* 215, 218 (1988) ("The Homeowners Association Act would apply to a condominium or cooperative only in the comparatively rare instance in which it is 'part of a development' because it is subject to the authority of a separate homeowners association.").

[23] In our view, neither measure would constitute an impact fee, imposed to offset the cost a government incurs to support new development, *see* 89 *Opinions of the Attorney General* 212, 213 (2004), because the funds and assessments would be payable not to the County, but to the HOA to offset costs incurred by the HOA. For a discussion of the "system of charges" that may be imposed for stormwater management, see 96 *Opinions of the Attorney General* 61.

*Johns River Water Mgmt. Dist.*, — U.S. —, 133 S.Ct. 2586, 2591 (2013) (citing *Dolan v. City of Tigard*, 512 U.S. 374 (1994), and *Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987)). The *Koontz* Court explained:

> Under *Nollan* and *Dolan* the government may choose whether and how a permit applicant is required to mitigate the impacts of a proposed development, but it may not leverage its legitimate interest in mitigation to pursue governmental ends that lack an essential nexus and rough proportionality to those impacts.

*Koontz*, 133 S.Ct. at 2595.

Here, the determination of whether the County's proposed financial measures would bear a reasonable nexus and be "roughly proportional" to the impact that a particular HOA development will impose on the public would depend on the facts specific to that development. Generally, however, you have described the inability of poorly-structured HOAs to maintain stormwater management facilities and common areas, and the burden on the County to address the ensuing nuisances and stormwater violations. The *Koontz* Court emphasized that "[i]nsisting that landowners internalize the negative externalities of their conduct is a hallmark of responsible land-use policy." *Koontz*, 133 S.Ct. at 2595. In our view, then, the *Nolan/Dollan* test would likely be satisfied by the proposed financial conditions to the extent they are designed to ensure that the burdens the County has assigned to the developer, and thence to an HOA, remain with those entities.

## III

### Conclusion

If read in isolation, the limitations on local powers in the Homeowners Association Act could create some doubt about a local government's authority to regulate the contents of HOA bylaws as a means of ensuring that HOAs maintain their facilities. However, the Act is more properly read in the context of other statutes that pertain to HOAs, and some of those statutes require local governments to implement State mandates through measures that will only be effective if HOAs are structured in a way that will enable them to perform their maintenance functions. We do not ascribe to the General Assembly the intent, on the one hand,

to require local governments to implement the State mandates we have identified above, and, on the other, to exclude a significant means by which they might do so. We also do not think that the HOA Act supplants the local governments' discretionary land use powers concerning the permitting of HOA subdivisions.

We therefore conclude that the County may enact reasonable bylaws measures related to ensuring that a prospective HOA will be able to maintain its common areas and facilities, so long as those measures do not contradict either the HOA governance provisions in the HOA Act or the provisions in the Corporations Article that apply to nonstock corporations. The County may also set reasonable conditions on the funding of an HOA by the developer.

Douglas F. Gansler
*Attorney General*

Ann MacNeille
*Assistant Attorney General*

Adam D. Snyder
*Chief Counsel*
 *Opinions & Advice*